UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
MARIE-ANGE JOSEPH,

                           Plaintiff,                **MEMORANDUM AND ORDER**

         -against-                        CV 08-3799(ARL)

NORTH SHORE UNIVERSITY HOSPITAL,

                           Defendant.
------------------------------------------------------------------X

**LINDSAY, Magistrate Judge:**

Plaintiff Marie-Ange Joseph ("Plaintiff" or "Joseph") commenced this employment discrimination action against defendant North Shore University Hospital ("Defendant" or the "Hospital") alleging violations of the Americans with Disabilities Act, 42 U.S.C. §§ 12101, et seq. (the "ADA") and Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. ("Title VII") on the basis of disability and national origin. The parties have consented to the undersigned's jurisdiction pursuant to 28 U.S.C. § 636. Before the court is Defendant's motion for summary judgment pursuant to Federal Rule of Civil Procedure ("Rule") 56. For the reasons set forth below, Defendant's motion is granted.

## BACKGROUND

The material facts, drawn from the Complaint and the parties' Local 56.1 Statements, are construed in the light most favorable to Plaintiff, the non-moving party, except as otherwise noted. *See Iannuzzi v. American Mortg. Network, Inc.*, 727 F. Supp. 2d 125, 130-31 (E.D.N.Y. 2010); *see Capobianco v. City of New York*, 422 F.3d 47, 50 n.1 (2d Cir. 2005).

**A.    Plaintiff's Disciplinary History**

Defendant is a general hospital facility located in Manhasset, New York. (Pl.'s & Def.'s

56.1 Stmts. ¶ 3.)  On April 29, 2002, the Hospital hired Joseph, an individual of Haitian national origin, as a part-time Outpatient Service Representative in the Hospital's Outpatient Registration Department.  (*Id.* at ¶ 4.)  Joseph was made a full-time Outpatient Service Representative at the Hospital on September 20, 2002.  (*Id.*)  She worked in a department that was comprised of six black employees (including Plaintiff and her supervisor Rosa Lee Raines), six Caucasian employees and eight Hispanic employees.  (*Id.* at ¶ 8.)  Of the six black employees, three of the individuals were of Haitian decent.  (*Id.*)  Plaintiff was a front-line Hospital employee, and as patients or visitors arrived at the Hospital, her job was to provide information, register patients, order patient tests, and document patient payments.  (*Id.* at ¶ 5.)  At all relevant times, Raines was Joseph's supervisor.  (*Id.* at ¶ 6.)

The Hospital maintains an Employee Handbook, which plaintiff received, that sets forth "Service Excellence Standards" requiring employees to be courteous, compassionate, respectful and mindful of their responsibilities when interacting with patients and colleagues in the workplace.  (*Id.* at ¶¶ 9-11.)  Defendant's Service Excellence Policy for Workplace Environment states that "[f]ailure to adhere to any established service excellence standard will not be tolerated and will subject the employee to disciplinary action, including termination."  (*Id.* at ¶ 15.)  In addition, the Employee Handbook contains a Non-Discrimination and Non-Harassment Policy that sets forth procedures for employees to report any actual or perceived complaints of discrimination.  (*Id.* at ¶ 14.)  Plaintiff also received a copy of the Hospital's Dress and Appearance Standards (the "Dress Code") for employees which required front-line female employees to wear stockings at all times and prohibited "low cut" blouses.  (*Id.* at ¶¶ 16-17.)

During her employment, between 2002 and 2007, the Hospital issued numerous

disciplinary warning notices to Joseph for the failure to carry out work assignments, rude and unprofessional behavior, dress code violations, and insubordination. (*Id.* at ¶¶ 36-39, 40-42, 43, 45-46, 47-48, 52-54,66-67, 68-71.) The disciplinary notices included a notice issued (i) in October 2003 upon the complaint of Hospital security that Joseph engaged in a verbal altercation with a patient process which required security response; (ii) in April 2003 based on a patient's complaint that Plaintiff was rude and unprofessional to her; (iii) in April 2004 based on a patient's complaint that Plaintiff spoke to the patient in a loud and rude voice, permitting other patients to hear the patient's confidential information; (iv) on March 3, 2005 for wearing a blue jean skirt to work despite the fact that jeans are prohibited by the Dress Code; (v) on March 9, 2005 for wearing pink jeans to work wherein she was advised that if she broke the Dress Code rules again she would be sent home without pay; (vi) on June 13, 2005 for wearing a short dress without stockings that exposed her bare legs wherein she was told that if she violated the Dress Code again she would be sent home without pay; (vii) on June 24, 2005 and August 3, 2005, *see infra*, for wearing a dress and skirt without stockings that exposed her bare legs; (viii) on November 1, 2005 based on a patient complaint that Plaintiff spoke in a rude and derogatory manner and slammed documents down on the counter; (ix) on June 18, 2007 for belligerent conduct towards her supervisor, including slamming down reports on a desk in response to a question posed by her supervisor; and (x) on May 25, 2007, *see infra*, for disrespectful behavior towards her supervisor, including speaking loudly in front of patients, refusing to follow directions, slamming down reports. (*Id.*)

In addition, during this time period, the Hospital counseled Joseph and issued numerous disciplinary warning notices concerning errors she made with respect to outpatient test orders and

physician information.  (*Id.* at ¶¶ 31-34, 35, 44, 56-57, 58-59, 60, 62.)  Those notices to Plaintiff

included a warning (i) in December 2002 for failing to properly register a patient for specific

tests ordered by doctors; (ii) in March 2003 for failing to properly order a lab test for a patient;

(iii) in July 2003 for failing to register a patient for an essential test requested by a physician; (iv)

in October 2003 for errors made in ordering a patient test which resulted in the patient being

credited for the improperly ordered test and having to reschedule the proper test; (iv) in March

2005 for ordering a PSA test for a female patient which it was not requested by a physician and

was an improper test for a female; (v) in February 2006 for ordering the wrong test for a patient

after having been instructed on the proper procedure the day before; (vii) on April 19, 2006 for

registering a patient with the incorrect physician information on the pre-registration forms; (viii)

on April 24, 2006 for registering a patient with the wrong physician; and (ix) in March 2007 for

failing to order the proper test for a patient, which then had to be canceled and reordered.  (*Id.*)

Plaintiff never asserted that any of the disciplinary warning notices resulted from

discrimination.

### (1)    Plaintiff's Foot Condition

According to Joseph, she suffers from a "foot condition" that prevents her from wearing

stockings and closed toed shoes in the summertime.  (*Id.* at ¶¶ 19-20.)  In June 2005, Plaintiff's

podiatrist, Daniel Girardi, M.D., diagnosed her foot condition as mild pes planus, commonly

referred to as a bunion.  (*Monroy Decl.*, dated March 17, 2010, Exs. 13.)  Plaintiff submitted a

doctor's note from Dr. Girardi to the Hospital that stated, "Due to painful foot pathology

[Joseph] cannot wear closed shoes or stockings that confine her toes."  (*Raines Decl.*, dated

March 17, 2010, Ex. 4.)  The Hospital excepted Joseph from its Dress Code requiring stockings

at all times and permitted her to forego hosiery provided she wore either long pants or long skirts/dresses.  (Pl.'s & Def.'s 56.1 Stmts. ¶ 27.)

**(2)  Plaintiff's Dress Code Violations**

Plaintiff was issued multiple warnings for violations of the Dress Code for wearing inappropriate and revealing clothing including wearing low cut tops which exposed parts of her brassiere and short skirts/dresses which revealed parts of her underwear.  In deference to Plaintiff's bunion problem she was exempted from the Dress Code requirement of wearing stockings as long as she otherwise attempted to cover her bare legs with pants or longer skirts/dresses.  Nonetheless, on June 24, 2005,  Supervisor Raines found it necessary to issue a warning regarding Joseph's violation of the Dress Code when she showed up in a short dress and no stockings.  (*Id.* at ¶ 50 -51, 81, 82; *Raines Decl.*, dated March 17, 2010, Ex. 13.) Specifically, the warning stated:

> Ms. Joseph, I understand that you have a foot condition which prevents you from wearing hosiery.  I therefore, granted you special permission to come to work without hosiery.
>
> On Monday, June 13th, you came to work with a short dress and no hosiery, at which time I informed you that you need to wear pants, long skirt or long dresses until your condition improves.  I further explained to you at that time, should [you] come in to work again with a short dress and no stockings [you] would be sent home without pay.
>
> Today you appeared at work again in a dress and no hosiery.  This is a violation of the dress code.  I suggest in the future, that you follow the appropriate dress code or disciplinary action will be taken.

(*Raines Decl.*, dated March 17, 2010, Ex. 13.)

On August 3, 2005, Plaintiff again wore a short skirt without stockings.  (*Id.*, Ex. 14; Pl.'s & Def.'s 56.1 Stmts. ¶ 51.)   Raines issued Joseph a handwritten notice advising her that she had

5

been previously warned about the appropriate dress code and would have to put on stockings or sign out and go home for the day. (*Id.*) Plaintiff then purchased stockings from the Hospital gift shop and wore the hosiery for the remainder of her shift. (*Monroy Decl.*, dated March 17, 2010, Ex. 9 at 179-82.) According to Defendant, Joseph continued to report to work wearing low cut blouses and short skirts in open defiance of the warnings she was given. (Raines Decl, dated March 17, 2010, ¶ 31.)

### (3)     Notice of Suspension for Insubordination and Dress Code Violations

On August 20, 2007, the Hospital issued Joseph a disciplinary warning notice regarding "Insubordination/Inappropriate Dress" and suspended Plaintiff for one day. (Pl.'s & Def.'s 56.1 Stmts. ¶¶ 86-87.) The disciplinary notice stated in relevant part:

> On . . . August 14, 2007, you proceeded to remove your thigh-high hosiery while speaking with the Supervisor in her office. On August 15, you again removed your hosiery and worked the balance of the day while wearing an abbreviated skirt with your bare legs exposed. When I addressed your inappropriate behavior/attire you proceeded to sing, "Send me home or give me Monday off" in front of staff and patients. The issue of inappropriate attire/conduct (specifically skirt length, uncovered legs, revealing clothing) in violation of the hospital/system dress code policy has previously been discussed with you . . . .
>
> On May 24, 2007 you were observed and warned about spraying an offensive and noxious substance in the Outpatient Registration Office.
>
> I have spoken to you about your inappropriate attire and insubordination on several occasions. Any further violations of System/Hospital/Departmental Policy or Procedures the result will be immediate termination.

(*Id.*; *Raines Decl.*, dated March 17, 2010, Ex. 29.)

Joseph grieved the one-day suspension, but her suspension was upheld.[1] (Pl.'s & Def.'s

---

[1]During the grievance process, Plaintiff did not claim that she was unfairly disciplined because she had a disability or because of her Haitian national origin. (*Id.*)

56.1 Stmts. ¶¶ 88-93.)

**(4)     Plaintiff's Termination**

On September 7, 2007,  Joseph's employment with the Hospital was terminated.  (Pl.'s &

Def.'s 56.1 Stmts. ¶ 103.)   Plaintiff's termination notice stated the following:

> On August 27, 2007, at 9:45 am, you told Ms. Delprincipe, Sr. Outpatient
> Representative, that you were going to take the empty boxes to your car.  Ms.
> Delprincipe told you take them later, when you are on break or when leaving for
> the day.  You ignored her direction, laughed at her in front of staff and patients
> and proceeded to take the boxes to your car.  Ms. Joseph should have remained in
> the Front Registration Area to address the needs of the next patient.  (You were
> aware, that the department was operating short staffed, as 2 employees were on
> vacation and normally there are 5 Outpatient Service Representatives on duty.)
>
> On September 6, 2007, you again behaved inappropriately towards your
> supervisor in the presence of staff/patient. . . .
>
> You have been counseled on many occasions regarding your
> inappropriate/insubordinate behavior.  This is unacceptable and against the We
> Care Standards, The Caring Model, Service Excellence and Policy and Procedure
> regarding behavior towards your Supervisor.  As you are aware, you were
> suspended on [8/20/07] for Insubordination/Inappropriate Attire.  At that time,
> you were informed, in writing, that any further violations of System/Hospital/
> Departmental Policy or Procedures the result would be immediate termination.
> Your employment will be terminated effective immediately.

(*Id.*; *Raines Decl.*, dated March 17, 2010, Ex. 31.)  Plaintiff received a copy of the September 7,

2007 termination notice, but refused to sign the bottom of the acknowledgment receipt.[2]  (Pl.'s &

Def.'s 56.1 Stmts. ¶ 104.)

Plaintiff filed an internal Hospital grievance of her termination.[3]  (*Id.* ¶ 109.)  On

_____

[2]At the time of her termination, Joseph did not complain that she was unfairly terminated
because of any disability or national origin.  (*Id.* ¶ 105.)

[3]During the grievance process, Joseph did not claim that she was unfairly terminated
because of any disability or her Haitian national origin.  (*Id.* ¶ 110.)

November 9, 2007, the Human Resources Manager notified Plaintiff in writing that the determination to terminate her employment was upheld and that the matter was closed. (*Id.* ¶ 111.)

## B. Procedural History

On December 31, 2007, Joseph filed a complaint of employment discrimination with the United States Equal Employment Opportunity Commission ("EEOC") through a joint filing with the New York State Division of Human Rights (the "NYSDHR") charging the Hospital with disability, race, and national origin discrimination in violation of Article 15 of the New York State Executive Law. (*Id.* ¶¶ 119-20.) Following an investigation, on April 30, 2008 the NYSDHR dismissed the complaint. (*Id.*; *Monroy Decl.*, dated March 17, 2010, Ex. 3.) On June 17, 2008, the EEOC adopted the NYSDHR's findings and dismissed the EEOC charge. (*Id.* at ¶ 121; *Monroy Decl.*, dated March 17, 2010, Ex. 4.)

On March 21, 2008, Plaintiff filed a complaint in New York State Supreme Court, Nassau County alleging disability and national origin discrimination under New York State Executive Law. (*Id.* at ¶¶ 122-24.) Plaintiff voluntarily filed a stipulation of discontinuance of the action in November 2008. (*Id.*)

Plaintiff commenced the instant action on September 22, 2008, alleging that Defendant (1) discriminated against her based on her disability, to wit, her foot condition and failed to reasonably accommodate her disability in violation of the ADA; (2) discriminated against her based on her Haitian national origin in violation of Title VII; and (3) subjected her to a hostile work environment based on her disability and national origin. Defendant now moves for summary judgment pursuant to Federal Rule of Civil Procedure 56.

**DISCUSSION**

## I.      Applicable Law and Legal Standards

### A.      Summary Judgment

Summary judgment is proper only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). "An issue of fact is genuine if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' A fact is material if it 'might affect the outcome of the suit under the governing law.'" *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). In determining whether an issue is genuine, "[t]he inferences to be drawn from the underlying affidavits, exhibits, interrogatory answers, and depositions must be viewed in the light most favorable to the party opposing the motion." *Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 202 (2d Cir. 1995) (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (per curiam)); *Ramseur v. Chase Manhattan Bank*, 865 F.2d 460, 465 (2d Cir. 1989)).

Once the moving party has met its burden, "the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986) (quoting FED. R. CIV. P. 56(e)). The nonmoving party cannot survive summary judgment by casting mere "metaphysical doubt" upon the evidence produced by the moving party. *Matsushita*, 475 U.S. at 586. Summary judgment is appropriate when the moving party can show that "little or no evidence may be found in support of the nonmoving party's case." *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1223-24

(2d Cir. 1994) (citations omitted). However, "the judge's role in reviewing a motion for summary judgment is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

In deciding an employment discrimination case, the Court of Appeals for the Second Circuit has cautioned that "intent often must be inferred from circumstantial evidence found in affidavits and depositions." *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 603 (2d Cir. 2006) (citations and internal quotation marks omitted). At the same time, the Court held that "summary judgment remains available for the dismissal of discrimination claims in cases lacking genuine issues of material fact." *Id.* . "The summary judgment rule would be rendered sterile . . . if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion." *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985). "[T]he salutary purposes of summary judgment — avoiding protracted, expensive and harassing trials — apply no less to discrimination cases than to commercial or other areas of litigation." *Id.* "When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." *Gallo*, 22 F.3d at 1224.

## B.     McDonnell-Douglas Burden-Shifting Framework

In an employment discrimination case such as this, where there is no direct evidence of discriminatory conduct, Plaintiff's discrimination claims brought under the ADA and Title VII are analyzed under the now familiar burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973). *See Sista v. CDC Ixis N. Am., Inc.,* 445 F.3d 161, 169 (2d Cir. 2006) (ADA); *Woodman v. WWOR-TV, Inc.,* 411 F.3d 69, 76 (2d Cir. 2005) (Title

10

VII).  Under *McDonnell Douglas* and its innumerable progeny, (1) a plaintiff must first establish a prima facie case of discrimination; (2) the burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions; if the employer does so, the *McDonnell Douglas* framework and its presumptions and burdens disappear, leaving the sole remaining issue of "discrimination vel non;" and, thus, (3) the burden shifts back to the plaintiff to prove that the employer's stated reason is merely pretextual and that race discrimination was an actual reason for the adverse employment action.  *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000).  Although intermediate evidentiary burdens shift back and forth under this framework, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff."  *Id.*

The Court will apply these principles to Plaintiff's ADA and Title VII claims in turn.

## II.     Plaintiff's ADA Claims Against Defendant

The ADA prohibits employment discrimination by a "covered entity . . . against a qualified individual on the basis of  disability in regard to . . . discharge of employees, . . . and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a); *see Sista,* 445 F.3d at 169.  Employers of persons with disabilities are required to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee."  42 U.S.C. §§ 12112(b)(5)(A); 29 C.F.R. § 1630.9(a).  To establish a prima facie case of disability discrimination, a plaintiff must demonstrate that: (1) the defendant is subject to the ADA; (2) the plaintiff has a disability within the meaning of the ADA; (3) the plaintiff was otherwise qualified to perform the essential functions of her job, with or without reasonable accommodation; and (4) the plaintiff suffered an

adverse employment action because of her disability.  *See Capobianco*, 422 F.3d at 56; *see also*

*Jacques v. DiMarzio, Inc.,* 386 F.3d 192, 198 (2d Cir. 2004).

In the instant matter, the Defendant does not dispute that the Hospital is subject to the

ADA or that Plaintiff was qualified to perform the essential functions of her job.  Rather,

Defendant maintains that Joseph fails to meet this burden because she is not disabled within the

meaning of the ADA.  The Court agrees.  Under the ADA, a person is disabled if she has: "(A) a

physical or mental impairment that substantially limits one or more major life activities[4]; (B) a

---

[4]The ADA does not define the terms "physical impairment," "substantially limits," and "major life activity."  However, the EEOC regulations implementing the ADA define these terms, and while not binding on the Court, do provide guidance concerning the interpretation of the statute.  *See Ryan v. Grae & Rybicki*, 135 F.3d 867, 870 (2d Cir. 1998).  A "physical impairment" is defined as:

> [a]ny physiological disorder, or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genito-urinary, hemic and lymphatic, skin, and endocrine.

29 C.F.R. § 1630.2(h)(1).

An individual is "substantially limited" in the ability to perform a major life activity if he is:

> (i) Unable to perform a major life activity that the average person in the general population can perform; or
> (ii) Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

29 C.F.R. § 1630.2(j)(1).  "The term 'substantially limits' means significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills, and abilities.  The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of

record of such an impairment; or (C) [is] regarded as having such an impairment."  *See* 42 U.S.C.

§ 12102(1).[5]  Plaintiff contends that she falls within the first and third prongs of the disability

definition under the ADA.

### A.  Impairment that Substantially Limits Major Life Activities

In determining whether an individual is  "substantially limited in a major life activity,"

the Court considers "(i) the nature and severity of the impairment; (ii) the duration or expected

duration of the impairment; and (iii) the permanent or long term impact, or the expected

permanent or long term impact of, or resulting from, the impairment."  29 C.F.R. § 1630.2(j)(2).

"Although almost any impairment may, of course, in some way affect a major life activity, the

ADA clearly does not consider every impaired person to be disabled."  *Brower v. Continental*

*Airlines, Inc.*, 62 F. Supp.2d 896, 903-04 (E.D.N.Y. 1999).  Therefore, in evaluating whether a

plaintiff has a disability, "courts have been careful to distinguish impairments which merely

---

working."  29 C.F.R. § 1630.20(3).

Finally, the term "major life activity" is defined to include "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i); *see Ryan,* 135 F.3d at 870 (identifying other major life activities such as sitting, standing, lifting and reaching).  The major life activities implicated by Plaintiff's opposition papers are walking and standing.  In her Complaint, Plaintiff makes clear that her disability did not prevent her from performing the essential functions of her job.  (Compl. ¶¶ 25-26.)

[5] On September 25, 2008, the ADA was amended.  *See* ADA Amendments Act of 2008 (the "ADAAA"), Pub. L. 110-325, 122 Stat. 3553 (2008).  The Act explicitly states that it "shall become effective on January 1, 2009."  *Id*.  Courts in this Circuit have held that the ADAAA does not apply retroactively.  *See McCowan v. HSBC Bank, USA, N.A.,* 689 F. Supp. 2d 390, 398-99 (E.D.N.Y.  2010) (collecting cases).  Given that the events giving rise to Joseph's claims occurred prior to the date when the ADAAA came into effect, the court will not apply the new provisions to the instant case.

*affect* major life activities from those that *substantially limit* those activities." *Id.* (emphasis in original).

"[S]hort term, temporary restrictions are not 'substantially limiting' and do not render a person 'disabled'" within the meaning of the ADA. *Levy v. Hustedt Chevrolet*, No. 05-4832 (DRH) (MLO), 2008 WL 5273927, at *5 (E.D.N.Y. Dec. 17, 2008); *see Adams v. Citizens Advice Bureau,* 187 F.3d 315, 316-17 (2d Cir. 1999); *Leahy v. Gap, Inc.,* No. 07-CV-2008, 2008 WL 2946007, at *4 (E.D.N.Y. July 29, 2008); *see also Green v. New York City Health & Hosp. Corp.*, No. 04-CV-5144, 2008 WL 144828, at *4 (S.D.N.Y. Jan. 15, 2008) ("To establish a disability under the ADA, there must be some proof of permanency."). "It is the limitation on the claimed major life activity that must be permanent or have a long term impact. The permanency of the mental or physical condition leading to the impairment is not necessarily sufficient." *Levy*, 2008 WL 5273927, at *5; *see Dantuono v. Davis Vision, Inc.*, No. 07-CV-2234 (TCP) (ETB), 2009 WL 5196151, at *3 (E.D.N.Y. Dec. 29, 2009) (holding "the limitation on the claimed major life activity cannot be temporary") (internal quotation marks and citations omitted). Temporary conditions, therefore, with no residual, substantial limitations do not constitute a disability within the meaning of the ADA. *See, e.g., Adams*, 187 F.3d at 316-17 (finding an employee was not disabled within the meaning of the ADA where temporary physical injuries prevented him from working for three and one-half months and showed no evidence of substantial ongoing limitations).

Joseph maintains that she is disabled within the meaning of the ADA because her ability to walk and stand is substantially limited by her foot condition. In support of this claim, Joseph proffers her deposition testimony that she could not stand for more than five minutes at a time

and that she had to use a cane to assist her in walking. (Pl.'s Mem. in Opp. at 12.) A review of the record, however, reveals that Plaintiff's foot condition was a temporary impairment with no evidence of a substantial ongoing limitation to a major life activity.

As an initial matter, Joseph describes her disability as a bunion and toenail pain[6] that restricted her from wearing hosiery at certain time, but that did not limit her ability to perform her job. The allegations in her Complaint aver in general terms that Plaintiff (i) has a "foot condition which constitutes a disability" under the ADA; (ii) needed to be accommodated "by not being required to wear hosiery at certain times;" and that (iii) "[u]nder no circumstance, however, [did her] disability prevent her from performing, in a reasonable manner, the particular duties that she was performing at the time that her employment was terminated." (Compl. ¶¶ 20, 22, 26.) In response to an interrogatory requesting that Joseph describe in detail the circumstances that support her claim that she is a "qualified individual with a disability" within the meaning of the ADA, Plaintiff similarly stated in general terms:

> I have a foot condition which constitutes a disability under the ADA. My supervisors had full knowledge of this condition and the affect that it had on me. I provided medical documentation to defendant concerning this condition and my need to be accommodated by not being required to wear hosiery *at certain times*.

---

[6]Plaintiff avers for the first time in her memorandum of law in opposition to the summary judgment motion that in addition to bunion and toenail pain, she complained to her treating doctors about pain from a hammertoe condition in both her feet. (Pl.'s Mem. of Law in Opp. At 11-12.) According to Plaintiff, even though this might contradict her prior deposition testimony, she "is not a podiatrist or other foot expert" and the court should defer to the records of her treating doctors rather than her testimony. (*Id.*) The court declines to do so. "Factual allegations that might otherwise defeat a motion for summary judgment will not be permitted to do so when they are made for the first time in the plaintiff's affidavit opposing summary judgment and that affidavit contradicts her own prior testimony." *Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir. 2001). Accordingly, statements of fact made for the first time in Plaintiff's opposition papers and which contradict her prior testimony will not be considered.

(*Monroy Decl.*, dated March 17, 2010, Ex. 7, at 4 (emphasis supplied).)  During her deposition, Plaintiff described her impairment as a bunion and toenail pain that restricted her from wearing hosiery in the summer:

> Q:  To be clear, what do you believe was your disability was?
>
> A:  That I have a foot problem, that I cannot wear hosiery, it hurt [sic] me, it give [sic] me a lot of pain when I wear socks and shoes during the summertime.
>
> Q:  And that foot condition was a bunion and the pain on your toenail?
>
> A:  Yes.

(*Monroy Decl.*, dated March 17, 2010, Ex. 9, at 79-80.)

Moreover, Joseph testified that her complaints to her podiatrist in 2005 regarding her foot condition concerned a hosiery restriction due to her bunion and toenail pain, particularly in hot weather:

> Q:  What were the complaints that you made to Dr. Girardi at that time specifically about your foot?
>
> A:  That my complaint, every time that I wear stockings with closed shoes that my pain is getting worse, that I couldn't wear stockings with my shoes.

(*Id.* at 128-29.)  Plaintiff testified that her foot condition prevented her from "wear[ing] stockings in the summer when her foot starts getting worse," and explained this "only happened in the summertime."  (*Id.*)   In the summertime, Joseph explained that she was unable to wear stockings and closed shoes together because of her bunion:

> Q:  What is painful to your toes?
>
> A:  The pain, the bunion that I have is very painful when it's getting hot in that shoes with the stockings, so it's getting irritated.

(*Id.* at 145.)

Further, by her own account, Joseph's foot condition did not interfere with her job performance nor did it substantially limit her ability to stand and walk. Plaintiff testified that her job required her to sit for most of the day, and that except for the period following her foot surgeries in 2002 and 2005, her foot condition did not limit her ability to bend or stand, and that she was only required to use a cane for walking during the one-month period following surgery. ((*Monroy Decl.*, dated March 17, 2010, Ex. 9, at 30, 122-23, 130-33; Compl. ¶ 26.) *See Brower*, 62 F. Supp.2d at 902-03 (finding expert report stating that plaintiff's foot bunions prevented "any extended walking or standing" was insufficient to raise a reasonable inference of an impairment that substantially limited a major life activity; although report showed plaintiff experienced difficulty with walking, it did not prove she was "disabled" within the ADA); *see also Zuppardo v. Suffolk County Vanderbuilt Museum*, 19 F. Supp. 2d 52, 56 (E.D.N.Y. 1998) (finding that "while [the plaintiff's] ability to walk may well be affected, it was not substantially impaired, and he failed to prove he was disabled as a matter of law") (internal quotation marks and citation omitted).

Finally, Joseph testified that her foot condition in 2002 was not permanent and had healed, that she was able to go back to wearing stockings to work in January 2006, and that throughout June 2005 and September 2007 she would at times wear stockings with closed toe shoes to formal events. (*Id.* at 123, 148, 152.)

In short, Plaintiff has failed to offer any evidence that her impairment substantially limited a major life activity. Her impairment, which resulted in a temporary hosiery restriction with closed shoes, with no alleged residual, ongoing limitations thereafter, fails to constitute a disability within the first prong of the disability definition under the ADA.

**B.**      **Regarded As Having Disability Under the ADA**

A plaintiff who is "regarded as" disabled is protected under the ADA even if she is not actually disabled. *See Giordano v. City of New York*, 274 F.3d 740, 748 (2d Cir. 2001); *Ruhling v. Tribune Co.,* No. CV 04-2430 (ARL), 2007 WL 28283, at *13 (E.D.N.Y. Jan. 3,2007) ("Under the third method of establishing a disability under the ADA, a plaintiff must show that she is 'regarded as' having an impairment that substantially limits one or major life activities" ). "Whether an individual is regarded as having a disability turns on the employer's perception of the employee, and is therefore a question of intent, not whether the employee has a disability." *LaBella v. New York City Admin. for Children's Servs.,* No. 02-CV-2355 (NGG) (KAM), 2005 WL 2077192, at *15 (E.D.N.Y. Mar. 28, 2005) (quoting *Francis v. City of Meriden*, 129 F.3d 281, 284 (2d Cir. 1997) (internal quotation marks omitted)). "While the decisive issue is the employer's perception of his or her employee's alleged impairment, the plaintiff must show that the employer regarded the individual as disabled within the meaning of the ADA." *Ruhling*, 2007 WL 28283, at *13. That is to say, in order for Joseph to prevail, she must adduce evidence that the Hospital regarded her as having a disability that substantially limited a major life activity. Plaintiff has failed to do so.

In support of her claim that Defendant regarded her as disabled, Joseph avers that the Hospital was aware of her foot condition "when it received a note from [P]laintiff's doctor and when Ms. Raines took steps to exempt plaintiff from wearing stockings and closed toe shoes." (Pl.'s Mem. in Opp. at 12.) This evidence alone is insufficient to compel a rational juror to find that the Hospital regarded Joseph as substantially limited in any major life activity. Moreover, the record shows that Defendant did not perceive Joseph's condition as disabled within the

meaning of the ADA.  In Ms. Raines' June 24, 2005 warning, she specifically stated that she had granted Joseph special permission to come to work without hosiery provided she wear long pants, skirt or dress and "until your condition improves."  (*Raines Decl.,* dated March 17, 2010, Ex. 13.)  Inasmuch as there is no record evidence that Defendant perceived her condition as anything other than a temporary impairment, Joseph's foot condition fails to constitute a disability within the third prong of the disability definition under the ADA.

In summary, because Plaintiff has not adequately set forth evidence in the record that she had an actual impairment that substantially limited a major life activity or that Defendant regarded her as having such an impairment, she has failed to demonstrate that she was an individual with a disability within the meaning of the ADA.   Accordingly, having failed to establish a prima facie case, Defendant's motion for summary judgment on Plaintiff's claim for discrimination on the basis of her disability is granted.

### C.      Failure to Make Reasonable Accommodation Under the ADA

Plaintiff's claim of disability discrimination based on Defendant's  failure to offer Joseph a reasonable accommodation for her impairment is equally unavailing.

In order to establish a prima facie case of disability discrimination for failure to accommodate under the ADA, an employee has the burden to demonstrate that: "(1) [she] was an individual who has a disability within the meaning of the statute; (2) the employer had notice of [her] disability; (3) she could perform the essential functions of the job with reasonable accommodation; and (4) the employer refused to make such accommodation."  *Parker v. Columbia Pictures, Indus.*, 204 F.3d 326, 332 (2d Cir. 2000) (internal quotation marks and citation omitted).

For the reasons discussed above, Plaintiff is unable to satisfy the first element of her prima facie case, namely, that she is an individual with a disability within the meaning of the ADA.

Accordingly, having failed to establish this element of the prima facie case, Defendant's motion for summary judgment on Plaintiff's claim of disability discrimination based on the failure to make a reasonable accommodation is granted.

### D. Hostile Work Environment Based on Disability Under the ADA

Plaintiff's claim that Defendant subjected her to a hostile work environment based on her disability likewise fails. "A plaintiff claiming hostile work environment based on disability must demonstrate that [she] is a member of the protected class. Which is to say, [she] must meet the definition of disability contained in the ADA." *Weiss v. Husted Chevrolet*, No. 05-4230 (DRH) (MLO), 2009 WL 2132444, at *8-9 (E.D.N.Y. July 13, 2009).

For the reasons discussed above, Plaintiff is unable to demonstrate that she is an individual with a disability within the meaning of the ADA. Accordingly, Defendant's motion for summary judgment based on Joseph's claim for hostile work environment based on disability is granted.

### III. Plaintiff's Title VII Claims Against Defendant

Title VII prohibits an employer from discriminating against any individual "with respect to his [or her] compensation, terms, conditions or privileges of employment, because of such individual's race, color, religion, sex or national origin." 42 U.S. § 2000e-2(a)(1). Plaintiff asserts that Defendant discriminated against her on the basis of her Haitian national origin by (i) subjecting her to disparate treatment in the terms and conditions of her employment; and (ii)

creating a hostile work environment.  (Compl. ¶¶ 29-35.)

## A.      Discrimination Based on National Origin

To establish a prima facie case of discrimination, a plaintiff must show that:

(1) she is a member of a protected class, (2) was qualified for the position she held, and

(3) suffered an adverse employment action (4) under circumstances giving rise to an inference of

discrimination.  *Ruiz v. County of Rockland*, 609 F.3d 486, 491 (2d Cir. 2010).   In the instant

matter, the Defendant does not dispute that Plaintiff, who is Haitian, belongs to a protected class.

Nor does the Hospital dispute that Joseph was qualified for her position or suffered an adverse

employment action when Defendant terminated her employment.  Defendant does, however,

argue that Joseph failed to establish that the circumstances surrounding her termination gave rise

to discrimination based on her Haitian national origin.  Discriminatory intent, therefore, is "the

critical issue."  *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 986 (1988).  Accordingly,

Plaintiff must present sufficient evidence to enable a rational trier of fact to find that she was

terminated on the basis of her national origin.[7]

Plaintiff first asserts that the disciplinary notices she received give rise to an inference of

national origin discrimination because others did not receive a disciplinary warning for engaging

in similar conduct.  (Pl.'s Mem. in Opp., at 19.)  "A showing of disparate treatment – that is, a

showing that an employer treated plaintiff less favorably than a similarly situated employee

---

[7]Plaintiff states in her opposition papers that in support of her claim for national origin discrimination under Title VII, "she relies upon her argument with reference to Point I," namely her arguments in support of her claim of disability under the ADA.  (Pl. Mem. in Opp. at 19.) For the reasons set forth above, Plaintiff is unable to demonstrate she is an individual with a disability within the meaning of the ADA, and therefore the Court will not include her arguments in support of a disability with its review of her discrimination claim based on national origin.

outside his protected group – is a recognized method of raising an inference of discrimination for the purposes of making out a prima facie case." *Mandell v. County of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003) (internal quotation marks and citation omitted). An employee may be considered similarly situated to a co-employee if she was (1) "subject to the same performance evaluation and discipline standards," and (2) "engaged in comparable conduct." *Graham v. Long Island R.R.*, 230 F.3d 34, 30 (2d Cir. 2000). "[T]he standard for comparing conduct requires a reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases, rather than showing that both cases are identical." *Id.* Thus, in order to establish an inference of discriminatory animus, Joseph must show that she was treated differently than individuals "similarly situated in all material respects." *Shumway v. United Parcel Serv., Inc.*, 118 F.3d 60, 64 (2d Cir. 1997); *see Ruiz*, 609 F.3d at 494. Joseph's allegations fall far short of this standard.

Without providing any details or citations to the record, Plaintiff identifies one employee, " a Spanish individual named Omar" who committed the same misconduct, but who did not receive a disciplinary notice. (Pl.'s Mem. in Opp., at 19.) A review of the record indicates that on May 23, 2007, Raines instructed both Plaintiff and Omar Timeo to assist patients who were waiting in the Outside Registration Department. (*Raines Reply Aff.* ¶ 11; *Raines Aff.,* Ex. 23.) Timeo, unlike Joseph, followed Raines' instructions and went to the front of the Department to register patients. (*Id.*) Joseph, on the other hand, refused to follow her supervisor's directions, instead picked up reports for sorting, sat back at her desk, yelled at Raines in a rude and disrespectful voice, continued to yell after Raines told her to stop because the patients could hear her, and slammed reports down on a recycle bin. (*Id.*) As a result of her inappropriate behavior,

Joseph was issued a disciplinary notice. Clearly, the facts and circumstances surrounding Timeo's behavior bears little resemblance to Joseph's conduct and therefore is insufficient to support an inference of discriminatory animus based on her Haitian national origin.

Next, Plaintiff argues that an indicia of discrimination can be inferred from an English-only policy in the workplace where Defendant "criticized [her] for conversing in French, her native language." (Compl. ¶ 18.) "[T]here is nothing in Title VII which protects or provides that an employee has a right to speak his or her native tongue while on the job." *Levitan v. The City of New York Human Resources Administration*, 625 F. Supp. 2d 85, 99 (E.D.N.Y. 2008) (internal quotation marks and citations omitted). Indeed, "[c]lassification on the basis of language does not by itself identify members of a suspect class and would not support an inference of intentional national origin discrimination." *Velasquez v. Goldwater Mem'l Hosp.*, 88 F. Supp. 2d 257, 262 (S.D.N.Y. 2000) (quoting *Soberal-Perez v. Heckler*, 717 F.2d 36, 41 (2d Cir. 1983) (internal quotation marks omitted)). "Neither the statute nor common understanding equates national origin with the language one chooses to speak." *Id.* (quoting *Garcia v. Gloor*, 618 F.2d 264, 268 (5th Cir. 1980)). It is only where an "English-only rule [is] used to discriminate intentionally against a person of a particular national origin, [that] an employer would have violated Title VII." *Id.* at 263.

In the case at hand, Plaintiff has failed to proffer any evidence connecting an English-only policy to a discriminatory animus by the Defendant based on her Haitian national origin. Rather, in her opposition papers, Joseph simply alleges that while she was criticized for speaking French, "[p]eople, on the other hand, could speak Spanish without consequence," and cites to a disciplinary notice as proof of Defendant's discrimination. (Pl.'s Mem. in Opp., at 19.) Such a

generalized and conclusory allegation absent any support is insufficient to raise an inference of discrimination.  *See Cameron v. Cmty. Aid For Retarded Children*, *Inc.*, 335 F.3d 60, 63 (2d Cir. 2003) (holding that "[c]onclusory allegations of discrimination, absent any concrete particulars," are insufficient to defeat summary judgment).

Plaintiff's citation to a disciplinary notice dated August 14, 2007 (and revised August 16, 2007) likewise fails to support an inference of national origin discrimination.  The notice at issue states:

Marie, you have been notified of the following:

You will need to change your attitude with reference to the work environment. You have created an unpleasant work environment for yourself, your co-workers and supervisors as follows:

1.     You constantly walk out of the office throughout the day without informing anyone of your whereabouts.  When asked about your frequent trips outside of the office, you stated that a co-worker has private conversations with the Assistant Supervisor on a regular basis, so why can't you leave the office to do the same?  This is clearly not the same thing, as the other staff members are physically in the Outpatient Registration office.  *Further, please remember that you too are having private conversations in the office (in another language).  Please also note that it is hospital policy to speak English in the office unless you are assisting a patient who only speaks your language (French).*

2.     You spoke to Melody Stevenson, the Assistant Supervisor and questioned Melody about the fact that one of the employees switched lunch hours with another employee, and why this was allowed.  If two employees agree to switch lunch hours and get the Supervisors approval for this, their lunch hours do not concern you.  I am advising you to stop upsetting the office with your angry confrontations.

3.     You are required to clean up your work area, prior to leaving, at the end of your work day.  Please pick up all alcohol pad wrappings that you are dropping on the floor around your chair.

4.     North Shore LIJ Health System has a dress code, and it is necessary to

wear hosiery when you wear a skirt or dress. Please also note that low cut dresses/blouses should not be worn to work (low cut blouses/dresses do not comply with NSLIJHS's dress code policy). There have been times when you were assigned to work in another department, and you removed your hosiery (this is unacceptable). Please be advised that you are required to adhere to the NSLIJHS Dress Code Policy at all times, while on duty. Therefore, please do not remove your hosiery, until you are officially off duty and physically out of the Outpatient Registration Office.

5. When you are spoken to regarding a situation, do not continuously remind me of what other staff members may or may not be doing. I will not discuss any other staff member's behavior with you; I can and will, only discuss your behavior with you.

6. Further, please refrain from being so defensive, loud and disrespectful when your supervisors speak to you regarding an issue. This behavior is considered insubordination and it must stop.

7. On Wednesday, August 15, 2007, you (once again) removed your hosiery prior to leaving the Outpatient Registration Office (after you were advised not to do this on August 14th and many times prior to this). Also, on August 15th, when I spoke to you about removing your hosiery prior to leaving the office, you laughed and said "send me home, or give me Monday off." This defiant, insubordinate behavior must cease.

(*Raines Decl.*, dated March 17, 2010, Ex. 24 (emphasis supplied).)

That portion of the disciplinary notice that focuses on Plaintiff's personal conversations in French appears is an instruction and reminder of Hospital policy, not a criticism of her Haitian national origin. In order to support an inference of discrimination, a reasonable jury would have to believe that the two sentences in the disciplinary notice "directly reflect[] the alleged discriminatory attitude." *Raskin v. Wyatt Co.*, 125 F.3d 55, 60-61 (2d Cir. 1997). "One stray remark that does not even by itself evince a discriminatory attitude is not sufficient to preclude summary judgment." *Velasquez*, 88 F. Supp. 2d at 262. Moreover, when the person who made the decision to hire plaintiff is the same person who made the decision to fire, "it is difficult to impute to her an invidious motivation that would be inconsistent with the decision to hire." *Grady v. Affiliated Cent., Inc.*, 130 F.3d 553, 560 (2d Cir. 1997). Here, Raines recommended

Joseph to be hired to the part-time position and thereafter recommended her to be promoted to a full-time position at the Hospital.  (*Raines Decl.*, dated March 17, 2010, ¶ 14.)  Finally, Joseph's deposition testimony is at odds with her claim of national origin discrimination based on criticism for speaking French.  At her deposition, Plaintiff testified that she, herself, did not speak French at the workplace, but rather a co-employee, Jessie Josama, an individual of Haitian national origin, spoke French to her and Plaintiff would not answer in French.  (*Monroy Decl.*, dated March 17, 2010, Ex. 9 at 58-60.)  Notably, Jessie Josama continues to be employed by the Hospital and supervised by Ms. Raines and has not reported or complained of any discriminatory treatment.  (*Raines Decl.*, dated March 17, 2010, ¶¶ 123-35.)  In sum, without more, the disciplinary notice does not support an inference of discrimination based on national origin with regard to Joseph's termination.  *See Agueta v. North Shore Long Island Jewish Health Sys., Inc.,* No. 01 CV 4031 (JG), 2003 WL 22670915, at *7 (E.D.N.Y. Nov. 6, 2003).

Considering all the evidence in the record and granting Joseph all of the inferences to which she is entitled, the Court finds that Plaintiff has failed to meet her burden to support an inference that the circumstances surrounding her termination gave rise to discrimination based on her Haitian national origin.  Accordingly, having failed to establish a prima facie case, Defendant's motion for summary judgment on Plaintiff's claim for discrimination on the basis of her national origin is granted.

### B.        Hostile Work Environment Claim Based on National Origin

Plaintiff's claim that Defendant subjected her to a hostile work environment based on her national origin similarly fails.  To establish a prima facie hostile work environment claim, the plaintiff must first show that her workplace "was permeated with discriminatory intimidation, ridicule, and insult," that was "sufficiently severe or pervasive to alter the conditions of the

victim's employment and create an abusive working environment." *Hayut v. State Univ. of New York*, 352 F.3d 733, 745 (2d Cir. 2003) (internal quotation marks and citation omitted). "A plaintiff must also demonstrate that she was subjected to the hostility because of her membership in a protected class." *Kassner v. 2nd Avenue Delicatessen Inc.*, 496 F.3d 229, 241 (2d Cir. 2007).

Joseph bases her hostile work environment claim on the same underlying acts she alleged in her national origin discrimination claim. (Compl. ¶ 34.) For the reasons set forth above, because Plaintiff has failed to meet her burden to support an inference that the circumstances surrounding her termination gave rise to discrimination based on her Haitian national origin, she is unable to demonstrate that she was subjected to hostility in the workplace because of her ethnicity. *See Alfano v. Costello*, 294 F.3d 365, 377 (2d Cir. 2002) ("[e]veryone can be characterized by sex, race, ethnicity, or (real or perceived) disability; and many bosses are harsh, unjust, and rude. It is therefore important in hostile work environment cases to exclude from consideration personnel decisions that lack a linkage or correlation to the claimed ground of discrimination. Otherwise, the federal courts will become a court of personnel appeals" ).

Accordingly, Defendant's motion for summary judgment based on Joseph's claim for a hostile work environment based on national origin is granted.

### CONCLUSION

For the foregoing reasons, Defendant's summary judgement motion is GRANTED. The Clerk of Court is directed to close this case.

**SO ORDERED.**

Dated: Central Islip, N.Y.
February 15, 2011

_____/s_____
ARLENE ROSARIO LINDSAY
United States Magistrate Judge